## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| AMBER L. NICHOLL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-3016 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

CHARLES H. EVANS, U.S. Magistrate Judge:

Plaintiff Amber L. Nicholl appeals from a final decision of the Social Security Administration (SSA) denying her application for Supplemental Social Security Income (SSI) under Chapters II and XVI of the Social Security Act, 42 U.S.C. §§ 423, 1381a. Plaintiff brings this appeal pursuant to 42 U.S.C. § 405(g). The parties have consented to a determination of this case by the United States Magistrate Judge, under 28 U.S.C. § 636. <u>Consent to Proceed Before a United States Magistrate (d/e 13)</u>. Pursuant to Local Rule 8.1(D), Plaintiff filed her Brief in Support of Complaint (Motion) (d/e 11), which the Court construes as a motion for summary

judgment. Defendant has filed Commissioner's Motion for Summary Affirmance (d/e 15) and Commissioner's Memorandum in Support of Motion for Summary Affirmance (d/e 16).

For the reasons set forth below, the Court determines that the SSA's decision is supported by the law and the evidence. The Plaintiff's Motion is denied. The Commissioner's Motion for Summary Affirmance is granted, and the decision of the Commissioner is affirmed.

## FACTS

Plaintiff applied for SSI on October 19, 2005, alleging a disability onset date of May 1, 2005. <u>Answer to Complaint (d/e 9)</u>, Ex. 1, <u>Social Security Transcript (Tr.)</u> at 15. At the time of her application, Plaintiff was twenty-one years old.

## I. Medical History

Plaintiff has received mental health treatment since at least 1998, when she tried to kill herself by overdosing on aspirin. <u>Tr.</u> at 292. She was prescribed Prozac and diagnosed with depression. In 2000, doctors noted that Plaintiff had difficulty with anxiety attacks, and again prescribed her Prozac. <u>Tr.</u> at 288. They subsequently placed her on Paxil in March 2001. <u>Tr.</u> at 286. In May 2003, Plaintiff was hospitalized for alcoholism

and saying that she wanted to kill herself. She again exhibited anxiety and symptoms of depression in spring 2004 and was placed on Zoloft. In April 2004, Plaintiff had a fight with a friend and took 20 Zoloft pills with beer. Tr. at 222.

On November 2, 2005, Plaintiff began treatment at Transitions of Western Illinois to address her anxiety issues, anger management problems, and history of self mutilation. Tr. at 322. A mental heath assessment revealed that plaintiff had a history of depression as a juvenile, disruptive behavior disorder, and borderline personality traits. Tr. at 323. Plaintiff indicated to her therapist, Melissa Penn, that she had trouble handling stress at work and had panic attacks. She was observed to be manipulative and attention seeking, with poor judgment. Tr. at 327. On December 6, 2005, Penn indicated that Plaintiff was beginning to open up and respond to treatment. Tr. at 345.

On December 27, 2005, Dr. Frank Froman of Psychology Associates in Quincy, Illinois, spent forty-five minutes examining Plaintiff. He indicated that Plaintiff was five feet, eight inches tall, weighed two-hundred thirty pounds, and was pregnant. Tr. at 330. Plaintiff lived with her grandmother because she did not get along with her mother, whom Plaintiff

described as a "bitch." Tr. at 330. She smoked a pack of cigarettes a day. Dr. Froman diagnosed her with panic disorder encroaching on agoraphobia; mixed substance abuse; borderline personality disorder; and obesity. He assigned her a GAF score of 50.[1] He noted that Plaintiff "will tend to take any criticism as devastating." Tr. at 332.

In 2006, Dr. Phyllis Brister performed a mental health residual functional capacity assessment of Plaintiff. Tr. at 72-74. Dr. Brister indicated that Plaintiff was moderately limited in some areas, such as the ability to understand and remember detailed instructions, and the ability to maintain concentration for extended periods. Tr. at 72. Dr. Brister found that Plaintiff was not significantly limited in her ability to interact appropriately with the general public, or maintain socially appropriate behavior. Tr. at 73. Dr. Brister diagnosed Plaintiff with borderline personality disorder, mixed substance abuse, and panic disorder. Tr. at 74.

A Psychiatric Review Technique from January 6, 2006, by Dr. Brister evaluated Plaintiff under Listings 12.06 (Anxiety-Related Disorders), 12.08

---

[1] The GAF scale was designed to "report[] the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th Ed. 2000). A score between 41 and 50 indicates "[s]erious symptoms" and "serious impairment in social, occupational, or school functioning . . . ." Id. at 34.

(Personality Disorders), and 12.09 (Substance Addiction Disorders).  <u>Tr.</u> at 76.   Dr. Brister found that Plaintiff did not meet the Paragraph B criteria or the Paragraph C criteria.  <u>Tr.</u> at 86-87.

Plaintiff continued seeing Penn throughout 2006.  Plaintiff indicated that she was still having trouble managing her anger toward other people, but that she had stopped taking her antidepressant medication.  <u>Tr.</u> at 358.  By January 17, though, Plaintiff was back on her medication, and subsequent visits revealed that her depression was lessening and that she was feeling less irritable.  <u>Tr.</u> at 363, 368.  In April, Plaintiff noted that the Lexapro was helping with her anger outbursts, but that she was having difficulty sleeping at night.  <u>Tr.</u> at 372.  Later that month, though, Penn observed that Plaintiff was irritable, had poor insight, and was not open to Penn's advice.  <u>Id.</u> at 373.   In May 2006, Plaintiff revealed that she was still finding it difficult to be in public and get along with others, mostly because of her low self-esteem.  <u>Tr.</u> at 382.   She was staying sober, and preparing for the birth of her child in August.  By the end of June, Plaintiff was feeling more depressed and fearful about the impending birth of her child and lack of support from her boyfriend, the baby's father.  <u>Tr.</u> at 383.

On July 11, 2006, Penn noted that Plaintiff had experienced outbursts of anger directed at her mother and friend, but that Plaintiff blamed these outbursts on others and had trouble accepting responsibility for her actions. Tr. at 384. Plaintiff reported crying spells on July 25, 2006, and Penn wrote that Plaintiff felt lonely and isolated, since most of her friends were drinking and doing drugs, and Plaintiff no longer cared to participate in that behavior. Tr. at 387. Penn observed that Plaintiff was cooperative, but seemed unmotivated to make changes. Tr. at 387. By August 8, 2006, Plaintiff appeared positive and focused on the future; she discussed with Penn the possibility of returning to college, getting a job, and being a good mother. Tr. at 388. However, on August 23, 2006, Plaintiff reported feeling irritable and having anger outbursts in response to the behaviors of other people. Tr. at 389. She brought her son to the appointment with her and indicated that, although she got frustrated when the baby cried, she felt that she was handling motherhood well. Tr. at 390.

By fall 2006, Plaintiff's depression had returned. A progress note from October 17, 2006, indicated that Plaintiff was having suicidal thoughts. Tr. at 398. On November 14, 2006, Penn recorded that Plaintiff was having anger outbursts and obsessive thoughts. Plaintiff had recently been placed

on Luvox.  Tr. at 403.  Plaintiff returned to see Penn on December 11, 2006, and said that she had stopped taking her medications because they prevented her from sleeping.  Tr. at 406.  Going off of her medication caused Plaintiff to be depressed and angry and disinterested in parenting her son.  Tr. at 406.  Plaintiff continued to struggle with her mental health issues throughout December, and eventually checked herself into the hospital on December 15 because she had thoughts of hurting herself and others.  Tr. at 419.

Plaintiff continued therapy with Penn into 2007.  On January 16, 2007, Penn wrote that Plaintiff was depressed, tearful, and had anger outbursts frequently.  Tr. at 427.  Plaintiff's mood had improved by February 6, in part because she had implemented some of the strategies Penn discussed with her.  She stated that her Lexapro and Seroquel medications were working well, and that she wanted to enroll in a community college. Tr. at 432. On February 20, Plaintiff indicated that her boyfriend had broken up with her and left, but that she was handling things well and using the breakup as an opportunity to focus on her future.  Tr. at 433.

On April 16, 2007, Plaintiff noted that she had not drank or smoked

marijuana for three weeks, and that she was frustrated by her ex-boyfriend's lack of involvement in their son's life.  Tr. at 440.  Penn noted that Plaintiff's mood was good and that she was pleasant.  Plaintiff indicated that she was looking for a job and was going to start college again.  Tr. at 480.  However, on May 14, 2007, Plaintiff reported an instance of self-mutilation to Penn, after Plaintiff's ex-boyfriend demanded visitation and custody rights of their son.  Tr. at 481.

In June 2007, Plaintiff participated in a program of vocational training through Transitions.  Tr. at 482.  Plaintiff identified janitorial work as a potential job, but stated that she wanted to avoid sales positions.  On June 20, 2007, Penn wrote that Plaintiff was doing well in school, and was coping well with the fact that her ex-boyfriend had recently married.  Tr. at 485.

In July 2007, Plaintiff was admitted to Blessing Hospital in Quincy, Illinois, with abdominal pain.  Doctors recommended that Plaintiff have her gallbladder removed to prevent future episodes.  Tr. at 469.  Plaintiff had to go off of her medications for this procedure, and appeared irritable and depressed when she met with Penn on July 24, 2007.  Tr. at 486.  Plaintiff reported falling behind in her college courses.  Penn

performed an assessment of Plaintiff and found that, although she had mood and borderline personality diagnoses, Plaintiff did not have any serious mental-health impairments. Penn assigned her a GAF score of 68. Tr. at 498-99. A progress note from August 14, 2007, indicated that Plaintiff was pleasant and cooperative, and that she agreed with Penn to reduce her therapy sessions to once per month. Tr. at 507.

A September 20, 2007, progress note indicated maladaptive behavior, fear of abandonment, and anger issues. Plaintiff was also having trouble sleeping, and was concerned that her medications were not working. Tr. at 509. In November 2007, Penn observed that Plaintiff had been making excuses for missing therapy appointments, and that she was depressed and irritable. Penn suggested that Plaintiff consult Dr. Sanchez about adjusting her medications. Tr. at 515.

On December 5, 2007, Dr. Jerry Aamoth, a clinical psychologist, conducted an examination of Plaintiff to determine her ability to do work-related activities on a sustained basis. Tr. at 517. Dr. Aamoth determined that Plaintiff's impairments did not affect her ability to understand, remember, and carry out instructions. However, he found that she had marked difficulty in interacting appropriately with the public and with

co-workers, and moderate difficulty interacting with supervisors and responding appropriately to situations in the workplace. Tr. at 518. Dr. Aamoth observed that Plaintiff was confrontational, cynical, argumentative, and took pride in pushing people away. Tr. at 518. He also noted Plaintiff's history of alcohol and marijuana abuse.

I.   Administrative History

Plaintiff applied for SSI on October 19, 2005, alleging a disability onset date of May 1, 2005. Tr. at 15. The SSA denied her application initially and upon reconsideration. Tr. at 15. Plaintiff untimely requested a hearing before an administrative law judge (ALJ), but her tardiness was excused for good cause shown. Tr. at 15. On January 14, 2008, Plaintiff and her attorney, D. Terrell Dempsey, appeared before ALJ Robert G. O'Blennis in Hannibal, Missouri, for a hearing. Vocational expert Darrell W. Taylor (Taylor) was present via telephone. Tr. at 15. Plaintiff's grandmother and uncle submitted written statements for the ALJ's review. See Tr. at 25.

Plaintiff testified at the hearing. She stated that she lived with her grandmother, uncle, and toddler in a house approximately forty-five minutes from Hannibal, and that she had driven to the hearing herself. Tr. at

31.     She completed high school, and was majoring in psychology at John Wood Community College before she dropped out due to the fact that she had to take a math class and did not believe she would do well in it. <u>Tr.</u> at 32.    Plaintiff also had a hard time managing her course load and missed several classes due to illness. <u>Tr.</u> at 43.

Her last job was at Little Caesar's Pizza in 2002 or 2004, but she only worked there for a few months because she was too nervous to speak on the loudspeaker. <u>Tr.</u> at 33-34.    She left at the end of her shift and never returned.  <u>Tr.</u> at 44.    She had previously worked at Dollar Tree, but quit because having to climb ladders was stressful. <u>Tr.</u> at 47. Plaintiff also worked at K-Mart in the fashion department as a sales associate, but was too afraid to interact with customers and "strange people," and quit shortly after training.  <u>Tr.</u> at 47-48.  Her work as a telemarketer was similarly unsuccessful because she would hyperventilate when talking to strange people on the phone. <u>Tr.</u> at 48.

Plaintiff stated that she was seeing Dr. Sanchez and Melissa Penn at Transitions, and had been doing so for two years. <u>Tr.</u> at 34-35.    Plaintiff testified that prior to her son's birth, she had episodes where she would cut herself because she felt "numb." <u>Tr.</u> at 50.    She stated

that she had done this since she was in fourth grade, but that she had only had one incident since her son was born in August 2006. <u>Tr.</u> at 49. Plaintiff also testified that she had nightmares, was irritable, and sometimes had panic attacks, crying spells, and irresistible urges to "bolt" when around other people. <u>Tr.</u> at 57.

Plaintiff's doctors prescribed Seroquel for her. She had stopped taking Lexipro because of some confusion regarding her medication plan and whether she was supposed to continue taking it. <u>Tr.</u> at 35. She saw Dr. Sanchez every few months, and Penn every other week or so. Plaintiff indicated that the Seroquel made her sleepy, and that she had trouble caring for her son in the mornings because she was so drowsy, in large part because she could not sleep at night. <u>Tr.</u> at 53. Plaintiff testified that in addition to the Seroquel, she took acid reflux medication and wore a night guard to help with TMJ. <u>Tr.</u> at 39-40. Plaintiff had a history of marijuana use, but had not used drugs since her son's birth in 2006. <u>Tr.</u> at 59.

Through Transitions, Plaintiff was involved in a job training program sponsored by the Illinois Department of Rehabilitation. <u>Tr.</u> at 46. However, the program was too stressful, and Plaintiff could not complete it. Plaintiff stated that she had trouble with all the jobs, including vacuum

cleaning, being too stressful.  <u>Tr.</u> at 47.

During the days, Plaintiff spent time with her son, teaching him words and playing with him.  She sometimes had trouble managing her son when he threw temper tantrums.  <u>Tr.</u> at 55.  She liked to read and had a library card.  <u>Tr.</u> at 37.  She also wrote poetry and posted it on the Internet.  <u>Tr.</u> at 40.  She occasionally prepared meals for herself and her son, but would only grocery shop at night.  <u>Tr.</u> at 38.  Plaintiff testified that a couple times a month she did not have the energy to attend to her personal hygiene.  However, Plaintiff testified that she did laundry.  Although she did not have many friends, Plaintiff indicated that the ones she did have would either talk to her on the telephone, or come over to visit her since she did not like to leave the house.  <u>Tr.</u> at 41-42.  Plaintiff also had a boyfriend, whom she had met on the Internet, and whom she had been dating for seven months. <u>Tr.</u> at 60.

Taylor, the vocational expert, also testified at the hearing.  He determined that Plaintiff had no relevant prior work experience.  The ALJ asked Taylor what type of employment, if any, someone with Plaintiff's age, education, and work experience could perform if the person could not have close interaction with the public and co-workers, and could

only perform simple, routine, or repetitive tasks. <u>Tr.</u> at 64. Taylor stated that there were unskilled positions available in Illinois, including hand-packer jobs and janitorial jobs. <u>Tr.</u> at 64. However, Taylor stated that with limitations on interactions with others, a janitorial position would be the best fit. <u>Tr.</u> at 65. Taylor also stated that missing work frequently would be a barrier to competitive employment, as would inability to handle criticism or meet goals. <u>Tr.</u> at 66-67. He indicated that an individual with a GAF score consistently at or below 50 would not be a mainstay in the workforce.

The ALJ denied Plaintiff's application in a written opinion dated February 25, 2008. <u>Tr.</u> at 12-23. He found that Plaintiff had not engaged in substantial gainful activity (SGA) since October 15, 2005, and that she had severe impairments of panic disorder, borderline personality disorder, and substance addiction disorder. <u>Tr.</u> at 17. However, at step three of his analysis, the ALJ determined that Plaintiff's impairments or combinations of impairments were insufficient to meet or medically equal relevant Listing criteria. He held that Plaintiff did not meet Listings 12.06, 12.08, or 12.09 because she only had mild, as opposed to marked, restrictions in her daily life. The ALJ pointed out that Plaintiff played

with and taught her son, prepared meals, did laundry, and maintained her personal hygiene. <u>Tr.</u> at 17.

In terms of social functioning, the ALJ found that Plaintiff's limitations were moderate, not marked, since she went to the grocery store, albeit at night, and conversed on the telephone with her friends. <u>Tr.</u> at 18. In making this conclusion, he relied on Dr. Froman's progress notes, which indicated that Plaintiff was pleasant and cooperative, and that medication was assisting Plaintiff with her anger issues. The ALJ also relied on Plaintiff's evaluation by the state agency, and on Dr. Aamoth's observation that, although Plaintiff had trouble interacting with the public and her co-workers, she had the ability to interact appropriately with her supervisors. <u>Tr.</u> at 18.

The ALJ went on to find that Plaintiff's difficulties with concentration, persistence, and pace were moderate. While he acknowledged that there was evidence of some limitations in these areas, the ALJ pointed out that Plaintiff was able to read news and fiction, as well as compose poetry. The ALJ relied on evidence from Dr. Froman, the state agency, and Dr. Aamoth in coming to this conclusion, as well as evidence from Plaintiff's therapist at Transitions. <u>Tr.</u> at 18.

The ALJ held that there was no evidence in the record of episodes of decompensation. The ALJ thus held that Plaintiff did not meet the Listings' "Paragraph B" or "Paragraph C" criteria, and went on to translate his findings into a residual functional capacity (RFC) assessment at step four of his analysis. Tr. at 19. He found that Plaintiff was limited "to simple, routine, and/or repetitive work" where she could avoid contact with co-workers and the general public, that did "not involve a lot of changes in the work routine or work setting." Tr. at 19. He noted that, despite some difficulty getting along with supervisors, Plaintiff could do so satisfactorily. Tr. at 19. The ALJ based his conclusion on the medical evidence in the record and Plaintiff's self-described symptoms.

The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible," in light of the other medical evidence of record. Tr. at 20. The ALJ based this credibility finding on the fact that Plaintiff's descriptions of her limitations did not match her actual activities. For example, despite her testimony that she had difficulty interacting with others because of anger issues, Plaintiff shopped, cared for pets,

attended college courses, and prepared meals. The ALJ also discounted Plaintiff's grandmother's and uncle's descriptions of Plaintiff's limitations, finding that they were not consistent with her activities. Tr. at 21.

The ALJ found that Dr. Froman's opinions regarding Plaintiff's conditions were not wholly reliable, as he had only examined her once and reviewed some medical records, and his opinions were inconsistent with the medical record as a whole, including the observations of Plaintiff's therapist at Transitions. Tr. at 21. On the other hand, the ALJ gave Dr. Aamoth's opinion that Plaintiff could perform simple, routine tasks great weight, finding that it was supported by the record as a whole. Tr. at 21.

Moving on, the ALJ determined that Plaintiff did not have past relevant work, although she did have a high school education and the ability to communicate in English. Tr. at 22. The ALJ relied on the testimony of the vocational expert and concluded that there was work Plaintiff could perform, such as a janitorial cleaning job (59,000 in Illinois). Tr. at 22. Based on this conclusion, the ALJ determined that Plaintiff was not disabled. Tr. at 22-23.

On April 10, 2008, Plaintiff sought review of the ALJ's decision. Tr. at 8. The SSA's Appeals Council denied her request for review on November 28, 2008. Tr. at 1-3. Plaintiff then filed this lawsuit, seeking judicial review.

## ANALYSIS

Plaintiff seeks review of the ALJ's decision on five grounds. She argues first that the ALJ did not give proper weight to the testimony of her grandmother and uncle. Her second and third arguments are that the ALJ did not appropriately treat the opinions of her consultative and treating psychologist. Fourth, Plaintiff argues that the ALJ did not accept the vocational expert's conclusion that she was unemployable. Plaintiff's final argument is that the ALJ was biased against her and claimants like her.

Judicial review of the Commissioner's final determination of disability is limited, and the Commissioner's findings of fact are treated as conclusive as long as they are supported by substantial evidence. 42 U.S.C. § 405(g); Halbrook v. Chater, 925 F. Supp. 563, 571 (N.D. Ill. 1996). "Substantial evidence" means evidence that "a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); Powers v. Apfel, 207 F.3d 431, 434 (7th Cir.

2000).  On review, courts may not reevaluate evidence, make new factual determinations, or substitute their judgment for that of the Commissioner.  Powers, 207 F.3d at 434-35.

Nonetheless, the court must look to the record as a whole to determine if there is "substantial evidence" supporting for the ALJ's decision.  Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985).  An ALJ's opinion need not evaluate "every piece of testimony and evidence submitted."  Zalewski v. Heckler, 760 F.2d 160, 166 (7th Cir. 1985).  All that is required is that the ALJ "considered the important evidence" in the opinion, thus allowing the courts to "trace the path of the ALJ's reasoning."  Stephens, 766 F.2d at 287.

In determining whether an individual is disabled for Social Security purposes, the ALJ must use the five-step sequence outlined in 20 C.F.R. §§ 404.1520(a) and 416.920(a).  Each step must be satisfied before moving on to the next step.  First, the ALJ determines if the claimant engages in "substantial gainful activity," (SGA) defined as work that involves significant physical or mental activities, usually done for pay or profit.  20 C.F.R. §§ 416.920(b), 416.972(a)-(b).  If the claimant is not involved in SGA, step two requires the ALJ to decide whether the

claimant has a medically determinable impairment that is "severe," or a combination of impairments that, taken together, are "severe." 20 C.F.R. § 416.920©. Severity is measured by whether an impairment significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 416.921; SSRs 85-28, 96-3p, 96-4p. If such an impairment is found, the ALJ proceeds to step three.

In step three, the ALJ evaluates whether the claimant's impairment meets criteria listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the ALJ decides in the affirmative, the claimant is disabled. If the claimant's condition is not equivalent to a Listing, the ALJ moves on to step four. Step four requires the ALJ to determine the claimant's residual functioning capacity (RFC). The ALJ considers all impairments, not just those found to be severe under step two. 20 C.F.R. § 416.945. The ALJ then determines whether the claimant has the RFC to perform past relevant work.

If the claimant is not able to perform past relevant work, the ALJ moves to step five, where she evaluates whether the claimant is capable of performing other work. 20 C.F.R. § 416.920(g). The ALJ takes into consideration the claimant's RFC, age, education, and work experience.

At this juncture, the SSA is responsible for producing evidence that demonstrates that there is work suitable for the claimant in the national economy. 20 C.F.R. §§ 416.912(g), 416.960©. If the ALJ determines that there is other work available to the claimant, the claimant is not disabled for purposes of SSI.

With these standards in mind and for the reasons described below, the Court addresses each of Plaintiff's arguments in turn, and finds that the ALJ's decision was supported by substantial evidence.

## I. TESTIMONY OF PLAINTIFF'S GRANDMOTHER AND UNCLE

Plaintiff first argues that the ALJ did not give full weight to the opinion testimony provided by her grandmother and uncle, in violation of Social Security Ruling (SSR) 96-7p.

SSR 96-7p requires that an ALJ evaluate the credibility of a claimant's description of symptoms in conjunction with "statements and other information provided by . . . other persons about the symptoms and how they affect the individual . . . ." SSR 96-7p. However, an ALJ need only "minimally articulate his . . . justification for rejecting or accepting specific evidence of disability." Scheck v. Barnhart, 357 F.3d 697, 700 (7th Cir. 2004). As long as there is substantial evidence to support the ALJ's

decision, and as long as a court can follow his reasoning, the court cannot disturb his determination.  <u>Stephens</u>, 766 F.2d at 287.

The record shows that, contrary to Plaintiff's contention, the ALJ evaluated the opinions of Plaintiff's grandmother and uncle in conjunction with the other evidence in her case.  The ALJ specifically rejected these opinions because they contradicted Plaintiff's testimony regarding  her daily and social functioning.  While Plaintiff's grandmother and uncle claimed that she had trouble operating in social contexts  and that she often experienced difficulty in doing day-to-day tasks,  Plaintiff's own  testimony revealed  that  she maintained friendships and was able to attend college on a part-time basis, maintain personal  hygiene, and  do  household  chores. The ALJ adequately articulated his reasons for discounting the testimony of Plaintiff's grandmother   and uncle.   This decision is supported  by substantial evidence, and the Court will not disturb it.

II.    <u>DR. FROMAN'S  CONCLUSION</u>

Plaintiff's second argument is that the ALJ failed to adequately explain why he was not adopting the opinion of consulting psychologist Dr. Froman, in  contravention of  SSR 96-8p.

An  ALJ  must  take into  account  the  opinions  of  medical  sources

when determining a claimant's RFC. SSR 96-8p. "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Id. As discussed above, an ALJ only has to minimally articulate his reasons for not accepting certain evidence. Scheck v. Barnhart, 357 F.3d 697, 700 (7th Cir. 2004). The Court must uphold the ALJ's decision if it is supported by substantial evidence. Stephens, 766 F.2d at 287.

Contrary to Plaintiff's assertions, the ALJ acknowledged and discussed Dr. Froman's opinion, but did not rely on it because he found that it was "not totally consistent with the evidence as a whole." Tr. at 21. Specifically, the ALJ found that Dr. Froman's findings were inconsistent with those of Plaintiff's therapist, and inconsistent with Plaintiff's descriptions of her daily activities. The ALJ noted that Penn, Plaintiff's therapist, indicated that Plaintiff's condition was improving over time with therapy. Dr. Froman spent only forty-five minutes with Plaintiff, and based his conclusions on that short interview and some treatment notes from other doctors. The ALJ gave more weight to Penn's long-term perspective on Plaintiff's condition, which was proper under Social Security Regulations. See 20 C.F.R. § 416.927(d)(2) (noting

that, generally, more weight is given to a treating source who can "provide a detailed, longitudinal picture of [the claimant's] medical impairments").

In short, the ALJ adequately explained why he was not adopting Dr. Froman's opinion, and substantial evidence supported this determination.

Therefore, Plaintiff's request for reversal on this ground is denied.

III.  DR. AAMOTH'S CONCLUSIONS

Plaintiff asserts that the ALJ erred by misconstruing Dr. Aamoth's opinions on Plaintiff's conditions.  Specifically, Plaintiff argues that, although the ALJ stated that Dr. Aamoth's findings were entitled to great weight, the ALJ did not properly describe Dr. Aamoth's findings in the written opinion.

Plaintiff's contention is without merit.  The ALJ described Dr. Aamoth's opinion as follows:

> Jerry Aamoth, M.S., indicated on December 5, 2007, that the claimant had substantial loss in her ability to interact appropriately with the public and with co-workers, but also indicated that the claimant could function satisfactorily in interacting appropriately with supervisors . . . .
>
> . . .
>
> Dr. Aamoth indicated that the claimant had more than slight

limitations in her ability to respond appropriately to usual work situations and to changes in a routine work setting but that she was still able to function satisfactorily. He further indicated that the claimant's ability to understand, remember, and carry out instructions were not affected by her impairments . . . .

Tr. at 18. This description is consonant with Dr. Aamoth's report, see Tr. at 517-18, and supports the ALJ's determination of Plaintiff's RFC and her need to avoid "close interaction with the public and with co-workers," and recognition that "[s]he has some difficulty getting along with supervisors but generally can get along and function satisfactorily with supervisors." Tr. at 19.

The ALJ's decision in this respect was supported by substantial evidence, and the Court denies Plaintiffs' request.

IV. VOCATIONAL EXPERT'S TESTIMONY

Plaintiff next argues that the ALJ improperly decided not to accept the vocational expert's testimony that she was "unemployable." Motion, p. 12. Plaintiff points out that Taylor, the vocational expert, said that a person who missed work more than twice a month would not be able to hold a job, and that a person with a GAF score of 50 was not employable. See Tr. at 65-67. Plaintiff maintains that this evidence, in conjunction with the testimony of her grandmother and uncle,

and the medical opinions of Drs. Froman and Aamoth, does not support the ALJ's conclusion.

While Taylor did testify that an individual who consistently had a GAF score of 50 would have difficulty maintaining employment, the record does not support the conclusion that Plaintiff herself consistently had a GAF score of 50 or lower. The question the ALJ posed to Taylor was based on Dr. Froman's assessment in 2005; however, the record shows that by 2007, Plaintiff's conditions were improving due to her therapy, so much so that her therapist, Penn, assigned her a GAF score of 68. Therefore, substantial evidence supports the ALJ's decision not to rely on Taylor's testimony in this respect.

With respect to absenteeism, Plaintiff's argument fails because there is no evidence in the record that she either missed work or did not show up on time for work. The evidence instead shows that Plaintiff would quit when work became too stressful for her, and that, at least in one instance, she waited until her shift was over to do so. See Tr. at 45. While Plaintiff testified that she might miss work once or twice a month because of her depression, the ALJ found that Plaintiff was not credible because her description of her symptoms did not match

the objective medical evidence.

Finally, Plaintiff argues that the ALJ's hypothetical question to Taylor was improper because it did not take into account the opinions of her grandmother, uncle, and Drs. Froman and Aamoth. However, as discussed above, the ALJ's decision to not rely on the opinions of Plaintiff's grandmother, uncle, and Dr. Froman was supported by substantial evidence; these opinions were not consistent with the record as a whole. Also, the ALJ's reliance on Dr. Aamoth was proper, and the ALJ did not misconstrue his opinion. The ALJ properly did not include the opinions he discredited in the hypothetical question, and properly included the limitations identified by Dr. Aamoth. Taylor testified that Plaintiff could perform janitorial work, even with her limitations.

The ALJ's decision not to rely on certain portions of Taylor's testimony, and the hypothetical question the ALJ posed to Taylor, are supported by substantial evidence, and Plaintiff's request is denied.

V.     ALJ BIAS

Plaintiff's final argument is that the ALJ has "a bias against applicants, primarily females, who are obese, allege mental impairments, and/or have fibromyalgia." Motion, p. 15. The Commissioner counters that the record

contains no evidence of ALJ bias, and that Plaintiff did not take advantage of administrative procedures designed to address alleged ALJ bias.

Due process of law "demands impartiality on the part of those who function in judicial or quasi-judicial capacities." <u>Schweiker v. McClure</u>, 456 U.S. 188, 195 (1982). Nonetheless, an ALJ is presumed to be unbiased unless the party alleging bias demonstrates that the ALJ has "a conflict of interest or some other specific reason for disqualification." <u>See</u> <u>id.</u> at 195-96. Under Social Security Regulations, a claimant who believes that an ALJ is biased against her can request review from the Appeals Council. <u>See</u> 20 C.F.R. § 404.940; 57 Fed. Reg. 49186-03. However, "[f]act finding with respect to bias claims is to be done at the administrative level and is waived if not brought up below." <u>Ward v. Shalala</u>, 898 F. Supp. 261, 269 (D. Del. 1995).

Plaintiff has waived her claim. The record reflects that she failed to present her bias claim at the administrative level when she appealed the ALJ's unfavorable decision to the Appeals Council. She cannot raise this claim for the first time on judicial review. The available administrative procedures afforded Plaintiff ample opportunity to raise a claim of prejudice

or partiality. She chose not to take advantage of those procedures, and therefore has waived her claim.

## CONCLUSION

THEREFORE, Plaintiff's Brief in Support of Complaint (d/e 11), which the Court has construed as a motion for summary judgment, is DENIED. The Commissioner's Motion for Summary Affirmance (d/e 15) is GRANTED, and the Commissioner's decision is AFFIRMED. All pending motions are DENIED as MOOT. This case is closed.

ENTER: February 22, 2010.

FOR THE COURT:

<u>       s/ Charles H. Evans      </u>
CHARLES H. EVANS
United States Magistrate Judge